UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JOHN ANDREW PANTAGES, JR.,

    Plaintiff,

v.                                    CASE NO.: 5:08-cv-116-Oc-10GRJ

CARDINAL HEALTH 200, INC., a
foreign for-profit corporation,
ALLEGIANCE HEALTH CARE
CORPORATION, a foreign for-profit
corporation,

    Defendant.
_____/

## AFFIDAVIT OF G. MARTIN WYNKOOP

STATE OF FLORIDA

COUNTY OF ALACHUA

    COMES NOW, G. Martin Wynkoop, *sui juris*, first being duly cautioned and sworn who deposes and states the following:

    1.    The following statements are based upon personal and firsthand knowledge, my background and experience, education and a review of records and documents.

    2.    I have 25 years experience in the medical device industry. Areas of experience would include (but are not limited to):

        – Corporate Guidance

        – Manufacturing, operations, and facilities

        – Regulatory affairs and quality assurance.

    Presently, I am a medical business consultant. My work experience setting forth those additional details of my education, background, and experiences is attached as Exhibit A. In my



EXHIBIT B

experience, I have worked with Class I Medical Devices. The Cardinal Health Thoracentesis Catheter (CAT 4341B) is a Class I Medical Device. My experience also includes medical device(s) that involve polymers. The catheter part at issue in this case is a polymer. Some medical devices I have experience with were new products. While the 4341B was not a new product, a change in plastic material is pertinent to the issues in this case. From 2003 to 2006, I was President of a medical device company. I understand the corporate responsibilities of a medical device manufacturer to patients. Based on the above experiences and background, I am familiar with the legal, logistical aspects of manufacturing, marketing, and selling Class I medical devices. I am familiar with the moral and legal obligations of a manufacturer of medical devices. I have participated in a management level decision in a medical device product recall.

3. I have reviewed thousands of pages of documents in connection with this specific litigation, which would include:

- Third Amended Complaint for Damages and Demand for Jury Trial
- Defendants' Answer and Affirmative Defenses
- Deposition transcript of Michelle Donatich
- Deposition transcript of Joseph Hutson
- Information on the Pre-Foil Pouch/White Catheter Guard Broken Catheters After December 2005 Meeting
- CD containing documents (CAR000001 – CAR002057) received from Cardinal Health responsive to a Request to Produce
- Two CD's containing documents received from Cardinal Health responsive to a Request to Produce (CAR2058 – CAR4540)
- Defendant's Response to a Request to Produce (September 2008)
- Deposition transcript of Pat Tucker
- Deposition transcript of Bruce Marchioni

2

- Standards of Business Conduct
- Deposition transcript of Vicky Audrain (Munroe Regional Medical Center)
- Deposition transcript of Judi Proctor (Munroe Regional Medical Center)
- Deposition transcript of James Larson
- Deposition transcript of Tracy Horst
- Deposition transcript of Deepa Patel

4. I have reviewed §768.72, Florida Statutes and an American Jurisprudence Treatise on punitive damages 5Y AMJURTrials 443 by Dennison & Friedman; as well as Winn & Lovett Grocery Co. v. Arden decision. I have read the allegations in the Third Amended Complaint, which includes a request for punitive damages.

5. First of all, Cardinal Health was negligent in its conduct in all phases relating to the 4341B Thoracentesis Catheter. This would cover many issues including but not limited to: from testing, manufacture, packaging, and warning, for examples of the 4341B Thoracentesis Catheter.

6. One such specific example of negligent conduct, Defendants changed the type of plastic used to make the catheter from PVC to PEBAX. (SP-99-018) However, they did _NO_ testing to determine this new plastic material's sensitivity to ultraviolet light. This was significant in that the "first generation" of the new PEBAX Thoracentesis Catheters resulted in numerous complaints that the catheters were "brittle" and broke during surgical procedures. In each of these documented complaints, the patient was injured, and, in most cases, required additional surgery.

7. These complaints resulted in a product recall. A product recall is a very significant event for any medical device company and should be treated with all due care to ensure the problem is resolved and will not be repeated. Although Michelle Donatich was

3

produced as a "corporate representative" to discuss reasons for the product recall, she testified that she did not know the reason for same. This knowingly negligent indifference to such a significant failure is appalling.

8. Cardinal Health undertook a failure investigation (F1-009-02) to determine why the catheters were breaking and identified ultraviolet light as the most likely reason for the catheter failures. This was also called UV light degradation. Cardinal Health confirmed what is well known within the medical device industry that UV light caused the PEBAX plastic to become unstable, to become brittle, and then lose its flexibility. The corrective action they took was the implementation of a white or opaque catheter guard to protect the flexible catheter piece from UV light. (SP-03-003)

9 Mr. Pantages' catheter was manufactured after the implementation of the white catheter guard. It was lot # L3N243; manufactured in October 2003; with an expiration date of June 2006.

10. Sometime thereafter, Cardinal Health became aware of additional complaints that were nearly, if not identical to the complaints involving the first generation of PEBAX catheters. This was documented by Tracy Horst in July 2005. (Her trending report, CAR2254, is attached as Exhibit B). During this timeframe, Cardinal Health planned additional corrective action to address definitively the UV light degradation issue. The corrective action involved the implementation of a foil pouch. (SP-05-022) There was no other possible cause that was addressed by this corrective action.

11. In each of the documented complaints of the catheters with the white or opaque catheter guard, the patient was injured and, in most cases, additional surgery was required.

12. At this point in time, 2005, as early as July but certainly no later than December of 2005; Cardinal Health was actually aware that the catheters were still failing, and that the

4

specific reason was the ultraviolet light degradation. The affected Thoracentesis Catheters included those manufactured with the white catheter guard, and, specifically, Mr. Pantages' catheter. They knew that there was a continued risk that this group of catheters were going to fail. (This is the "risk-benefit" analysis that Michelle Donatich testified to). They knew that patients were going to be injured by the defective catheters. And yet, they decided not to take further corrective action. This is negligence. Cardinal Health had a responsibility to protect the public health from products that present a risk of injury. The 4341 B thoracentesis catheter was one such product. They failed in discharging this duty to Mr. Pantages and many other patients who similarly had adverse experiences and were injured.

13. Despite this knowledge of a defect in the catheter ad how to fix the defect (foil pouch); Cardinal Health does nothing to warn of the risk of failure and injury.

14. At a minimum, Cardinal Health had a legal obligation and moral obligation to warn consumers and hospitals, like Munroe Regional Medical Center, of the defect in the product; to-wit, the UV light degradation issue. Had they done so, I believe, they would have removed the Pantages catheter and it would not have been used by Dr. Bapatla and Mr. Pantages would not have been injured by the defective catheter. The Munroe Regional Medical Center representaives' depositions support this.

15. The following descriptive phrases are borrowed from the ALR Article and that I believe appropriately describe Cardinal Health's conduct:

— Reckless disregard for public safety

— Culpably indifferent

— Grossly indifferent

— Recklessly indifferent

— Consciously indifferent

16. It is further my opinion, that Cardinal Health's actions constitute "gross negligence" as that term is used in §768.72, Florida Statutes and, specifically, as it is defined by §768.72(2)(b).

17. Regrettably, as a result of the Defendant's conduct, Mr. Pantages was injured.

FURTHER AFFIANT SAYETH NOT.

_____
G. Martin Wynkoop

STATE OF FLORIDA    )
                    )
COUNTY OF ALACHUA   )

BEFORE ME, the undersigned authority personally appeared the above named _G. Martin Wynkoop_, on the _3_ day of _Feb_, 2009, personally known to me to be the person described in and who executed the foregoing instrument and has produced the following as his/her identification and did take an oath:

ID:_____.

_____
NOTARY PUBLIC, STATE OF FLORIDA

COMMISSION NUMBER:

Lisa S. Bruno
COMMISSION # DD665310
EXPIRES: APR. 19, 2011
WWW.AARONNOTARY.com

6

**G. MARTIN WYNKOOP**
9341 S.W. 33rd Road
Gainesville, FL  32608
352-331-5155
E-mail: KoopCo@cox.net

## SUMMARY

Entrepreneur business professional with twenty-five years in the medical device industry.  Built successful business opportunities from ground up.  Experienced in strategically growing the corporation using strengths of leadership, problem solving, innovation, presentation and follow through. Areas of experience:

| | |
|---|---|
| Business Plan development & implementation | Manufacturing, Operations & Facilities |
| Corporate Guidance | Regulatory Affairs & Quality Assurance |
| Building dedicated workforce | Established Company Policy & Procedures |
| Capital Investment including: | Stock Plan & Benefits Package |
|     Angel, Venture & Grants | Key Physician Contacts & Compliance |
| IP Management | Liability & Insurance Protection Program |
| Financial Model Development & Oversight | Univ of Florida Entrepreneurship Mentor/CEO |
| Established Banking Relationships including LOC | National Youth Leadership Training, Director |

## EXPERIENCE & ACHIEVEMENTS

### KOOPCO, LLC                                                                                           CURRENT

*Medical Business Consultant,* Gainesville, Florida
Establish business organization with in small developing companies.  Develop business plans for small emerging medical devices companies.  Write sales and marketing plans, develop regulatory strategy & create operational direction.  Established and managed distributor sales network. Helped grow revenue in several companies of 3x.  Some of the companies assisted: Atlas Spine, Biomedical Enterprises, Inc., NovaBone, LifeTek Medical, Medical Specialties, Integra Life Sciences, VibeTech Inc., Audigence, University of Florida, AlloSource, Nanotherapeutics, Inc., Woodbine Endoscopy and Aberlyn Holdings Investment Group.  Medical expert witness.

### ORTHOHELIX SURGICAL DESIGNS, INCORPORATED                                           2003 TO 2006

*President & Chief Operating Officer,* Akron, Ohio
Founder.  Corporate Secretary.  Established the business organization and structure of the company.  Developed and presented the business plan that secured over $12 million in funding. Developed the regulatory strategy & created operational direction.  Established the sales network.

- ➢ Achieved positive cash flow 16 months after first sale
- ➢ $1 million revenue in first 12 months of sales
- ➢ Built dedicated work force of 15
- ➢ Oversaw Regulatory & Quality Assurance program
- ➢ Developed Financials & routine tracking
- ➢ Managed all systems development
- ➢ Initiated & taught the Development Team process
- ➢ Two Patents Issued & five Pending
- ➢ Successful exist after securing large Venture Capital investment


EXHIBIT

Confidential

G. MARTIN WYNKOOP                                                                   PAGE TWO

REGENERATION TECHNOLOGIES, INCORPORATED                                             2000 TO 2003

*Business Unit Marketing Manager & National Account Manager,* Gainesville, Florida
Supervised key relationships, contract administration & corporate accounts. Full P&L accountability. Developed & launched new products for spine, arthroplasty & trauma. Responsible for international sales revenue, production planning & operations. Supervised three clinical studies.
- Managed the $40m orthobiologics market segment growth of 28% & exceeded sales target by 20%
- Initiated alternate allograft development program
- Assisted key customer -- Exactech, in establishing their biologic business model
- Wrote & implemented Orthopedic business plan for corporation
- Developed, implemented and taught successful sales training programs

EBI, A DIVISION OF BIOMET                                                           1996 TO 2000

*New Spine Products Manager,* Parsippany, New Jersey
Launched new products; **Omega21™** Spinal Fixation System & **VueCath™ Spinal Endoscopy** System. The Omega21 System was at 142% of Budget and achieved over $10m in first year sales.

- Wrote and implemented Spinal Endoscopy business plans
- Developed, launched & taught sales training products for spine and pain management
- Managed development teams for successful product launch

DAVIS & GECK ENDOSURGERY, AN AMERICAN CYANAMID COMPANY                              1993-1996

*Senior Product Manager,* Wayne, New Jersey
- Management responsibility for new endoscopic product development
- Launched the **LAPRO-CLIP™ Ligating Clip,** a Bio- Absorbable Polymer product
- Developed, implemented and taught successful worldwide sales training programs.

LINVATEC, EDWARD WECK, INC., A BRISTOL-MYERS SQUIBB COMPANY                         1983-1993

*Product Manager, Linvatec, Weck Endoscopy,* RTP, N. C. & Largo, FL.   1991-1993
- P&L responsibility for $15 million, Increased Market Share, 8% for endoscopic instruments
- Developed and released SENSATEC™ Instruments. Most successful product by Weck/Linvatec
- Improved Gross Margin 12% and worked with manufacturing to reduce cost by 20%.
- Produced three major catalogs, many advertising campaigns, and over fifteen brochures

*Assistant Sales Manager,* Cleveland, Ohio                                           1990-1991
- Managed 10 direct representatives in the Northeast region, most successful region in company.
- Grew region endoscopic sales over 4 fold in one year.

*Sales Representative, Executive Sales Trainer,* Cleveland, Ohio                    1983-1990
- Sales Representative of the Year, 1988 & Consistently in Top 10% of sales force
- Mix Master Award, most groups over 100%, 1988, 1989 & 1990
- Grew territory over 7 fold in eight years ($200,000 to $1,500,000)

## EDUCATION

Grace College, BS -- Psychology & Business Administration                1980

Confidential



Tucker DEP. EX. NO. 21
FOR I.D., AS OF 9-25-08

# FIR/QIS Review Report

| Tracking #: FI-009-02 | Type of CAPA: _X_ FIR ___ QIS |
|---|---|
| Review Date: 7/14/05 | Owner: Jim Larson / Fred Bible |

Project or Complaint Reference: PEBAX Catheter Breakage (Customer Complaint)

**DESCRIPTION OF FIR/QIS IN PROGRESS:**

Due to an increased number of customer complaints for catheter breakage an investigation was initiated. This FI resulted in a product recall in November 2002. Additional complaints received in March 2004 resulted in the identification of lots being missed in the reconciliation of the first recall and a second recall was initiated in April 2004. Product continues to be returned on a very limited basis and Professional Services will be filing closure documentation with the FDA.

**STATUS**

On-going monitoring of complaints has reveled the initial corrective action of a white catheter guard to be an adequate short term fix.

**ISSUES:** (Resourcing Needs, Priority Levels, Roadblocks, etc)

Continued trending indicates the white catheter guard may be protection for the catheter for 12-24 months but it does not eliminate the UV exposure and may still allow degradation of the product.

Testing of catheters packaged in UV inhibiting pouches is being evaluated. A new resin material is also being evaluated, this resin may not be susceptible to UV degradation and would then not require any type of additional packaging. Once test results are reviewed and documented the results will be shared with the Senior MPS Mgmt team to determine if this is an acceptable method to reduce the degradation.

**PROJECTED TIME TO CLOSURE:** Closure will not occur until results of the packaging is completed or until FDA recall closure is completed. No projected date is available at this time.

**COMMENTS GENERATED DURING MEETING REVIEW:**

N/A

Submitted by: Tracy Horst 7/13/05
FSP-125/Form 5   DCC No.: MN03157   Issue Date: 03/27/03   Page 1 of 1

For Use By Affiliates of Cardinal Health 200, Inc., Medical Products and Services group of Cardinal Health

EXHIBIT B

CONFIDENTIAL CAR002254